UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIEHUA HUANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AIRMEDIA GROUP INC., HERMAN MAN GUO and RICHARD PEIDONG WU,<br><br>Defendants. | Civil Action No. 1:15-cv-4966-ALC<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ....................................................................................1

JURISDICTION AND VENUE ..............................................................................6

PARTIES ..............................................................................................................7

CLASS ACTION ALLEGATIONS ......................................................................8

AIRMEDIA'S ORGANIZATIONAL STRUCTURE BEFORE AND DURING THE CLASS PERIOD ....................................................................................10

AIRMEDIA'S CFO TURNOVER AND INTERNAL CONTROL WEAKNESSES PRIOR TO THE CLASS PERIOD ....................................................................12

AIRMEDIA'S BUSINESS AND FINANCIAL CONDITION BEFORE, AND AT THE BEGINNING OF, THE CLASS PERIOD ....................................................14

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING thE CLASS PERIOD ..................................................18

A. The April 7, 2015 Statements and Announcement of the Purported Sale of 5% Equity in AM Advertising to Liantronics ..........................................18

B. The April 24, 2015 Statements ..........................................................21

C. Pearson's April 28, 2015 Report, AirMedia's April 29, 2015 Response and Pearson's April 30, 2015 Rebuttal ..................................................23

D. The May 18, 2015 Statements and Investor Conference Call ..............29

E. The June 15, 2015 Statements and Announcement of the Sale of 75% Equity in AM Advertising for a Lower Implied Value ...............................34

LOSS CAUSATION ............................................................................................38

ADDITIONAL SCIENTER ALLEGATIONS .........................................................40

PRESUMPTION OF RELIANCE ..........................................................................44

NO SAFE HARBOR ............................................................................................46

COUNT I ............................................................................................................47

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against all Defendants ..........................................................................47

**Page**

COUNT II ..... 48

For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ..... 48

PRAYER FOR RELIEF ..... 48

JURY DEMAND ..... 49

Lead Plaintiff China Xiayuan Transportation Co. Ltd. ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by AirMedia Group Inc. ("AirMedia" or the "Company"), AirMedia conference call transcripts, media and analyst reports about the Company, and interviews of relevant witnesses. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This securities class action is brought on behalf of all purchasers of the American Depositary Receipts ("ADRs") of AirMedia between April 7, 2015 and June 15, 2015, inclusive (the "Class Period"), seeking remedies against AirMedia and two of its highest-level executives, Chairman and Chief Executive Officer ("CEO") Herman M. Guo ("Guo") and Chief Financial Officer ("CFO") Richard P. Wu ("Wu") (collectively, "Defendants"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated by the SEC thereunder.

2. AirMedia operates advertising platforms primarily in the People's Republic of China ("China" or the "PRC"). At all relevant times, the Company's ADRs were registered and traded on the NASDAQ Global Select Market ("NASDAQ"). The Company's ADRs traded below $2 immediately before the Class Period and had traded around that level for the previous three years. At $2 per ADR, AirMedia's market capitalization was approximately $100 million.

3. During the Class Period, Defendants engaged in a scheme to artificially inflate the value of AirMedia's advertising affiliate, AirMedia Group Co., Ltd. ("AM Advertising"),

and the trading price of the ADRs, by announcing an illusory "contract" they knew would never – and *could* never – be performed. This announcement had the intended effect of engendering an impression in the market that AM Advertising – and, by extension, AirMedia – deserved an outsized valuation, driving AirMedia's market capitalization to more than $500 million virtually overnight. Additionally, CEO Guo personally benefited from the fraud through his substantial ownership position in both AirMedia and AM Advertising, while CFO Wu and other insiders sought to capitalize on the artificially inflated ADR price by seeking to sell substantial portions of their holdings in AirMedia before the exposure of the full truth.

4. Specifically, on April 7, 2015, after the market closed, AirMedia issued a press release announcing that it had sold 5% of the equity of AM Advertising to an LED advertising display manufacturing company, Shenzhen Liantronics Co. Ltd. ("Liantronics"), for RMB150 million.[1] The Liantronics transaction implied a value for AM Advertising of RMB3 billion ($484 million), well above AirMedia's market capitalization shortly before the announcement. This robust valuation of AM Advertising caused the price of AirMedia's ADRs to skyrocket by 150% over the next three weeks.

5. While AirMedia disclosed this transaction in its April 7, 2015 press release, it concealed the underlying contract and failed to fully describe its terms. On April 28, 2015, investor and Forbes contributor Richard Pearson ("Pearson") published an English translation of the terms of the contract, which he found written in Chinese on Liantronics' website. He also issued a detailed report concluding that the Liantronics deal was a sham because the contract contained undisclosed conditions precedent that AM Advertising – a poorly performing unit of

[1] At the start of the Class Period, the exchange rate between the Chinese Yuan (RMB) and the U.S. dollar (USD) was 1 RMB = 0.1614 USD, or 6.1958 RMB = 1 USD. Thus, RMB150 million was equal to $24.2 million. At the end of the Class Period, the exchange rate was 1 RMB = 0.1611 USD, or 6.2066 RMB = 1 USD.

AirMedia – could never fulfill. For example, the contract required AM Advertising to achieve an unrealistic $31 million profit target for fiscal year ("FY") 2015, and allowed Liantronics to terminate the transaction if AM Advertising did not satisfy the condition. Liantronics even had the option to walk away from the transaction for any reason, rendering the agreement illusory.

6. As Pearson explained, the Liantronics deal operated more as a short-term loan to AirMedia than a claimed sale of 5% of AM Advertising. Specifically, Liantronics could pay the purchase price and subsequently unwind the transaction virtually at any time, receiving its principal and an additional payment (akin to interest) as a percentage of that sum. Pearson's investigation also revealed that Liantronics had not conducted any due diligence before entering into the transaction, which confirmed the non-binding and illusory nature of the deal.

7. The following day, April 29, 2015, AirMedia attempted to control the damage by attacking Pearson's report and perpetuating falsehoods about the Liantronics transaction. In an unusual press release, in which the Company printed a letter from CEO Guo to the shareholders, AirMedia characterized the Liantronics transaction as "arms-length and serious" and dismissed as "erroneous" the assertion that Liantronics had not conducted due diligence. Yet AirMedia did not dispute Pearson's description or interpretation of the terms of the contract. Nonetheless, Defendants' continuing misrepresentations had the intended effect of buoying the trading price of the ADRs, as they continued to conceal the truth regarding the value of AM Advertising and AirMedia's prospects and condition. These falsehoods allowed them to buy enough time to cover themselves with another transaction.

8. The truth about the Liantronics transaction emerged six weeks later. On June 15, 2015, AirMedia announced a definitive agreement to sell 75% of AM Advertising to another buyer, Beijing Longde Wenchuang Fund Management Co., Ltd. ("Longde Wenchuang"), for

RMB2.1 billion ($338 million), and disclosed that it would terminate the Liantronics contract in connection with this new transaction. However, in contrast to its disclosure regarding the terms of the Liantronics deal, which were made piecemeal and did not reveal the $31 million target, AirMedia fully described the terms of the Longde Wenchuang transaction, which included even more unrealistic profit targets over a longer period of time.

9. Specifically, the new transaction requires AM Advertising to earn aggregate net profit equal to or exceeding RMB1.0592 billion ($170.6 million) for combined fiscal years 2015 to 2018, with that amount broken down into targets for each year. If AM Advertising does not meet the targets, Longde Wenchuang is entitled to the *remaining* 25% interest for no additional consideration – actually representing a valuation for the entirety of AM Advertising as much as 30% below the total value implied in the Liantronics deal. Thus, although the new deal implies a valuation of RMB2.8 billion ($451 million) for all of AM Advertising, AM Advertising's failure to achieve the profit targets could result in the conveyance of the *entire* business for the initial price of just RMB2.1 billion.

10. Alternatively, the new contract allows Longde Wenchuang to rescind the deal if AM Advertising fails to generate net profit of at least RMB150 million ($24 million) in 2015, or if various other conditions are not satisfied. In that instance, Longde Wenchuang may return the equity interest it purchased in AM Advertising and recover its purchase price, plus a "capital usage fee." In this sense, the new contract operates exactly like a short-term loan.

11. Notwithstanding Defendants' positive portrayal of the new transaction, investors learned that the valuation ascribed to AM Advertising in the earlier *Liantronics* transaction was artificially inflated. Indeed, investors understood that because it is even more unlikely that AM Advertising can meet the profit targets associated with the new transaction, it is a virtual

certainty that AirMedia will have to transfer the rest of AM Advertising to Longde Wenchuang for no consideration. Thus, investors learned that Defendants actually valued AM Advertising – and, by extension, all of AirMedia – at 30% less than the value implied by the Liantronics deal.

12. These revelations caused the price of AirMedia's ADRs to fall dramatically over several days as the market digested the news. In fact, the price dropped from a close of $7.26 per ADR on June 12, 2015 – the day before the announcement – to $3.52 on June 18, 2015, representing a combined decline of nearly 52% over this period, on unusually high trading volume. Plaintiff and the other members of the Class suffered substantial harm as a result.

13. The impact on the trading price and volume of the ADRs of the announcement of the purported Liantronics transaction on April 7, 2015 and the subsequent revelation of the truth, as compared to the historical trading price and volume for three years prior to the Class Period, is illustrated in the following chart:




14. By contrast, CEO Guo – who directly and indirectly held approximately 76.11% of AM Advertising – would benefit by the cash infusion associated with the new transaction,

even if forced to forfeit the remaining 25% of that entity. Indeed, the value of AM Advertising implied in the new transaction simply would have been unattainable in the absence of the prior announcement of the fraudulent – and abandoned – 5% sale of AM Advertising.

## JURISDICTION AND VENUE

15. Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act.

16. This Court has personal jurisdiction over Defendants because AirMedia's ADRs are registered and traded on the NASDAQ, a securities exchange operating in New York, and Defendants disseminated false and misleading representations in New York with the purpose of reaching U.S.-based investors. Accordingly, Defendants transacted business in New York and are subject to New York's long-arm statute, N.Y. C.P.L.R. §302, because they, or their agents, purposefully availed themselves of the privilege of conducting activities in this forum. Further, AirMedia authorized its counsel to accept service of the initial complaint and intends to defend the litigation in this forum, confirming its assent to personal jurisdiction here.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the ADRs were traded on the NASDAQ throughout the Class Period and the alleged misconduct was transacted in and emanated from this District.

18. In connection with the acts alleged, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19. Plaintiff purchased ADRs during the Class Period as set forth in its Certification, which was submitted in connection with its application for appointment as Lead Plaintiff and is incorporated by reference herein, and has been damaged thereby.

20. Defendant AirMedia is incorporated in the Cayman Islands and headquartered in Beijing, China. As detailed below, AirMedia conducts substantially all of its business through its subsidiaries and consolidated variable interest entities ("VIE"), including AM Advertising, through which AirMedia conducted substantially all of its business. The Company's ADRs were listed under the ticker symbol "AMCN" on the NASDAQ, an efficient market, throughout the Class Period. As of March 31, 2015, the Company had 119,942,413 ordinary shares outstanding, with each ADR representing two ordinary shares.

21. Defendant Guo is, and was throughout the Class Period, Chairman of AirMedia's Board of Directors ("Board") and its CEO, positions he has held since the Company's inception. As detailed below, Guo directly or indirectly owns a substantial percentage of AM Advertising and, by AirMedia's own admission, was deemed to be the "actual controller of AM Advertising under PRC law[.]" Additionally, at all relevant times, he and his wife were beneficial owners of a substantial portion of the Company's ordinary shares. For example, as of March 31, 2015, they beneficially owned approximately 32.88% of such outstanding ordinary shares.

22. Defendant Wu is, and was throughout the Class Period, CFO of AirMedia, a position he has held since June 2014. On information and belief, Wu was educated in the U.S., maintains a residence in Carmel, Indiana, and continues to have extensive ties to the U.S. He has advanced degrees from the University of Pennsylvania and Indiana University.

23. Defendants Guo and Wu are referred to herein collectively as the "Individual Defendants," and together with AirMedia as "Defendants."

24. Given their executive-level positions and responsibilities at AirMedia, as well as their involvement in approving and disseminating the false and misleading statements alleged herein, it is appropriate to treat the Individual Defendants as a group for pleading purposes and to attribute the responsibility for such statements to each of them.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the ADRs of AirMedia during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the ADRs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AirMedia and/or its transfer agent and may be notified of the pendency of this action by mail or other means, using the form of notice similar to that customarily used in securities class actions.

27. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as alleged herein.

28. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants misrepresented material facts about the business and operations of AirMedia;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of conduct complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f) whether the market prices of AirMedia's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages, and, if so, the appropriate measure of damages.

30. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## AIRMEDIA'S ORGANIZATIONAL STRUCTURE BEFORE AND DURING THE CLASS PERIOD

31. AirMedia is a holding company that operates its business through subsidiaries and affiliated entities, including VIEs. According to the April 24, 2015 Form 20-F for the fiscal year ended December 31, 2014 ("FY 2014 Form 20-F"), AirMedia does not directly or indirectly own any equity interests in its consolidated VIEs or their subsidiaries, but is the primary beneficiary of and purportedly effectively controls them via contractual arrangements with them and their record owners. The Company also purports to consolidate the financial results of these VIEs and their subsidiaries in its consolidated financial statements in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").

32. During the Class Period, the consolidated VIEs were: (i) AM Advertising; (ii) Beijing AirMedia Shengshi Advertising Co., Ltd. (formerly known as Beijing Shengshi Lianhe Advertising Co., Ltd.) ("Shengshi Lianhe"); (iii) Beijing AirMedia Jiaming Advertising Co., Ltd. (formerly known as Beijing AirMedia UC Advertising Co., Ltd.) ("Jiaming Advertising"); and (iv) Beijing Yuehang Digital Media Advertising Co., Ltd. ("AM Yuehang"). The Company conducts its business primarily through its subsidiaries, including AirMedia Technology (Beijing) Co., Ltd. ("AM Technology"), and relies on dividends and other distributions on equity paid by such entities. Additionally, AM Advertising owned and/or managed most of the assets responsible for generating AirMedia's Class Period revenues,

33. The following diagram, adapted from the FY 2014 Form 20-F, depicts, among other things, the structure of AirMedia and its indirect ownership of AM Technology (solid lines represent equity interests):




34. The following diagram, also adapted from the FY 2014 Form 20-F, depicts, among other things, AM Technology's control of AM Advertising (footnotes are omitted; solid lines represent equity interests and broken lines represent contractual arrangements):




35. Furthermore, Defendant Guo and other insiders maintain significant ownership interests in the consolidated VIEs, directly or indirectly. According to the FY 2014 Form 20-F:

> Certain of our directors and officers are shareholders in the VIEs, AM Advertising, Shengshi Lianhe, Jiaming Advertising, and AM Yuehang. Mr. Herman Man Guo, our chairman and chief executive officer, in addition to holding 16.00% in our company, also directly and indirectly holds approximately 76.11% of AM Advertising, 79.86% of Shengshi Lianhe and 76.20% of Jiaming Advertising. Mr. Qing Xu, our director and executive president, in addition to

> holding 2.16% of our company, also directly and indirectly holds approximately 11.20% of AM Advertising, 11.94% of Shengshi Lianhe and 11.27% of Jiaming Advertising. Mr. James Zhonghua Feng, our director and president, in addition to holding 3.85% of our company, also holds 80% of AM Yuehang. In addition, Mr. Guo and Mr. Xu are each a director of Jiaming Advertising, Shengshi Lianhe and AM Advertising, Mr. Guo is the legal representative of each of AM Advertising, Shengshi Lianhe and Jiaming Advertising and Mr. Feng is the sole director and legal representative of AM Yuehang.

36. These ownership interests were so extensive that the Company included a risk warning in the FY 2014 Form 20-F regarding the inherent conflicts presented, cautioning: "For these directors and officers, their fiduciary duties toward our company under Cayman law – to act honestly, in good faith and with a view to our best interests – may conflict with their roles in the VIEs, as what is in the best interest of the VIEs may not be in the best interests of our company or the unaffiliated public shareholders of our company."

37. Nevertheless, AirMedia disclosed that it had no agreements in place to resolve these conflicts of interest and had not designated a separate fiduciary, without such conflicts, to represent the interests of the Company's unaffiliated public security holders. Yet these conflicts *motivated* CEO Guo to place his personal interests ahead of the Company's unaffiliated public investors, as alleged herein.

## AIRMEDIA'S CFO TURNOVER AND INTERNAL CONTROL WEAKNESSES PRIOR TO THE CLASS PERIOD

38. The rampant turnover in AirMedia's CFO position prior to the Class Period not only reflected the Company's inherent inability to ensure compliance with financial reporting requirements during the Class Period, but also undermined its prospects of achieving reasonable financial targets. In fact, the lack of consistency in the CFO position resulted in the Company's acknowledgement of internal control deficiencies over financial reporting.

39. Since 2010, five different individuals have served as the Company's CFO. In March 2010, Conor Yang stepped down as CFO and was replaced by Xiaoya Zhang as interim

CFO. The following year, in February 2011, Ping Sun was appointed CFO. AirMedia changed CFOs again the next year when, in September 2012, Henry Hin-hung Ho became CFO. In June 2014, Defendant Wu became CFO of AirMedia.

40. The significant turnover in the CFO position took a heavy toll on AirMedia's financial reporting department and its internal controls. In its April 30, 2012 Form 20-F for FY 2011, AirMedia identified a material weakness in its internal controls due to "high turnover in [its] accounting and financial reporting department," including "in the chief financial officer, the financial controller, and the financial reporting director and other key positions within the accounting and financial reporting department." Thus, as of December 31, 2011, the Company had "identified a control deficiency related to the lack of accounting personnel with sufficient knowledge of U.S. GAAP that constitutes a material weakness."

41. The Company even had significant internal control deficiencies in FY 2007, the year it went public. In its April 30, 2008 Form 20-F for the FY 2007, AirMedia disclosed that "in connection with the audit of [its] consolidated financial statements for the year ended December 31, 2007, [its] independent registered public accounting firm noted a number of control deficiencies in [its] internal control over financial reporting, including certain significant deficiencies."

42. In light of AirMedia's high CFO turnover and previous material weaknesses in its internal controls – and in conjunction with the Company's historically poor performance and a soft advertising market, described herein – the Company lacked a reasonable basis to establish attainable profit targets in connection with its proposed transactions involving the sale of equity in AM Advertising.

## AIRMEDIA'S BUSINESS AND FINANCIAL CONDITION BEFORE, AND AT THE BEGINNING OF, THE CLASS PERIOD

43. Until 2015, AirMedia focused primarily on generating revenue by advertising in airports in China. Substantially all of the Company's revenue was generated from providing air-travel advertising services. In its April 25, 2014 Form 20-F for the FY ended December 31, 2013, AirMedia described its advertising operations as follows:

> [O]ur advertising network primarily consisted of standard digital frames, traditional media in airports such as billboards and light boxes, digital screens on airplanes, digital TV screens in airports, mega-size LED screens in airports, unipole signs and other outdoor media, and various traditional advertising formats in gas stations.

44. Historically, AirMedia has not been a profitable company. Although its gross revenue grew substantially from FY 2007 to FY 2011, increasing from $43.6 million to $277.8 million,[2] AirMedia nevertheless lost money four out of five of those years (only earning a profit in FY 2008). Its loss of $12.6 million in FY 2011 was the largest loss during that period.

45. The Company's Form 20-F for FY 2012, filed with the SEC on April 29, 2013, shows that, despite growing overall revenues, operating losses continued to mount. In FY 2012, revenues for digital TV-screens in airports ("DTVSiAP") continued a four-year decline. Yet non-airport revenues for FY 2012 consisted of only $14 million from gas stations (4.9% of total revenue), and $10 million from "other media" (consisting of unipole operations and other outdoor media) (3.5% of total revenues).

---

[2] Growth in revenue generated from digital frames in airports ("DFiAP") led the way, rising from $1.2 million in FY 2007 to over $126.5 million in FY 2011. DFiAP is a general category of electronic screens, including items such as mega-sized LED screens and standalone digital frames, on which digital advertising is displayed.

46. Moreover, in FY 2012, AirMedia reported a net loss of $32.2 million primarily due to a dramatic rise in operating expenses. Specifically, the Company experienced significant increases in concession fees,[3] rising from $134.2 million in FY 2010 to $160 million in FY 2011 to $177.9 million in FY 2012, as a result of escalation clauses and expansion of services. According to the FY 2012 Form 20-F, the Company also "impaired all goodwill related to [its] air travel areas reporting unit and [its] outdoor media advertising media reporting unit and incurred an impairment loss of $20.6 million in 2012" using a discounted cash flow analysis, which indicated that management expected declining revenue in that segment going forward.

47. FY 2013 marked an inflection point for AirMedia as gross revenues declined for the first time (on top of net revenue declines of the prior six years), and the Company suffered a net loss of $11.5 million. The Company's Form 20-F for FY 2013, filed with the SEC on April 25, 2014, showed that DFiAP still grew from $137.3 million to $152.3 million due largely to "rapid growth" in mega-LED, and DTVSiAP grew very slightly (ending four years of declines), but TV-screens on airplanes, traditional media in airports, and media in gas stations all declined. Total operating expenses returned to normal levels, as no goodwill impairment was required.[4]

48. In FY 2014, losses from AirMedia's advertising operations accelerated, and the Company announced plans to enhance its position as a Wi-Fi provider on commuter trains and airplanes. After the markets closed on March 9, 2015, AirMedia announced its unaudited financial results for the fourth quarter and FY 2014. In FY 2014, net loss grew to $31.8 million, up from $11.5 million in 2013. Net loss attributable to AirMedia's shareholders in FY 2014

[3] Concession fees are payments to airports for operating digital frames, digital TV screens and other traditional media displays; to airlines for placing programs on digital TV screens; and to gas stations for operating traditional media displays, such as billboards. These arrangements usually involve an exclusivity period of three to five years.

[4] AirMedia did not mention Wi-Fi as a source of revenue in its Form 20-F for FY 2013.

was $25.7 million, up from $10.6 million in 2013. AirMedia's total revenue fell year-over-year, and revenue from DFiAP declined for the first time since at least 2010, dropping from $152 million to $138 million. DTVSiAP and TV-screens on planes stayed mostly flat, but traditional media in airports declined from $64.8 million to $56.7 million.

49. The following chart, adapted from the FY 2014 Form 20-F, depicts AirMedia's revenue and gross profit from its primary operations for FY 2010 through FY 2014:

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 |
| | (In thousands of U.S. Dollars, except share, per share and per ADS data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenues: | | | | | |
| ***Air Travel Media Network*** | | | | | |
| Digital frames in airports | $ 113,196 | $ 126,539 | $ 137,342 | $ 152,346 | $ 138,527 |
| Digital TV screens in airports | 28,905 | 21,937 | 13,731 | 14,110 | 13,286 |
| Digital TV screens on airplanes | 27,564 | 26,734 | 26,612 | 16,160 | 16,212 |
| Traditional media in airports | 48,418 | 73,535 | 83,478 | 64,845 | 56,723 |
| Other revenues in air travel | 4,063 | 6,416 | 7,346 | 9,183 | 6,395 |
| ***Gas Station Media Network*** | 3,664 | 12,873 | 14,217 | 12,726 | 11,164 |
| ***Other Media*** | 10,650 | 9,787 | 10,239 | 7,146 | 13,564 |
| Total revenues | 236,460 | 277,821 | 292,965 | 276,516 | 255,871 |
| Business tax and other sales tax | (5,955) | (7,197) | (6,223) | (4,250) | (3,390) |
| Net revenues | 230,505 | 270,624 | 286,742 | 272,266 | 252,481 |
| Cost of revenues | (197,908) | (244,470) | (250,606) | (244,673) | (235,835) |
| Gross profit | 32,597 | 26,154 | 36,136 | 27,593 | 16,646 |

50. Importantly, AirMedia blamed the decline in revenue from the DFiAP line on "a soft advertising market" and attributed the decline in traditional media to the "termination of certain unprofitable or low-margin contracts so as to focus our resources on the more profitable ones." Earnings from other revenue sources rose slightly, which was attributed to unipole signs and other outdoor media. Total operating expenses rose modestly from $45.7 million to $51.4 million, due to increased selling and marketing expenses.

51. On March 9, 2015, Defendants Guo and Wu discussed AirMedia's fourth quarter and FY 2014 financial results on a conference call with analysts and investors. According to Guo, in January 2015, AirMedia "divested two of [its] three major unprofitable product lines," which purportedly would allow it to "concentrate on promoting the remaining product lines" and produce "an immediately positive effect on the Company's results of operations in the first

quarter of 2015." Additionally, in February 2015, AirMedia sold an 81% equity interest in Beijing AirMedia Jinsheng Advertising Co., Ltd. ("Jinsheng"), which operated the TV-attached digital frames line (part of the DFiAP line), for just $1.2 million. AirMedia also intended to divest itself of DTVSiAP entirely by transferring it to Jinsheng, as well.

52. Defendant Guo also discussed AirMedia's "transformation into a leading in-flight and on-train Wi-Fi operator in China." In the face of declining advertising revenue, AirMedia had embarked on a campaign to monetize its expanding efforts to provide Wi-Fi to travelers. AirMedia obtained concession rights to install and operate Wi-Fi systems on board high-speed and ordinary trains operated in China. In response to questioning, Guo explained that AirMedia intended to generate revenue from Wi-Fi through usage fees paid by Wi-Fi users traveling on planes, fees paid by intranet users on trains (but not for internet, which would be provided without charge), and payments received from companies to promote their applications.

53. Defendant Wu also spoke to analysts on the March 9, 2015 conference call about AirMedia's efforts to divest the TV-attached digital frames and the digital TV-screens in airport lines, stating, in pertinent part, as follows:

> The divestiture will benefit our bottom lines. We had total loss from operations to [sic] the [US]$10.4 million and [US]$13 million from TV-attached digital frames and airport digital TV screens in fiscal year 2013 and fiscal year 2014. Our new business initiatives are still at the stage with need for further investments. As a result of these investments, our costs and operating expenses have been increasing in the past several quarters, which contributed to the increase in our net loss. However, these investments are necessary and crucial, as Wi-Fi business stands for a huge market and the future of the Company.

54. Thus, before the start of the Class Period, AirMedia was operating in a "soft" advertising environment, facing declining revenues across all business lines, and investing substantial funds into Wi-Fi operations that did not generate any appreciable amount of revenue. Against this backdrop, Defendants announced a sham transaction with Liantronics to artificially

inflate the value of AM Advertising and the price of AirMedia stock to levels that were otherwise unattainable, as detailed further below.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

55. On April 6, 2015, the day before the Class Period begins, AirMedia ADRs traded below $2, implying a valuation of approximately $100 million for the entire Company. Indeed, during the three years prior to the start of the Class Period, the ADRs hovered around $2 on average daily volume of 225,000 ADRs traded.

### A. The April 7, 2015 Statements and Announcement of the Purported Sale of 5% Equity in AM Advertising to Liantronics

56. The Class Period begins on April 7, 2015. On that date, AirMedia issued a press release entitled "AirMedia Sells 5% Equity Interest of its Advertising Business for RMB150 million," which provided, in pertinent part, as follows:

> AirMedia . . . today announced that Beijing Shengshi Lianhe Advertising Co., Ltd., a variable interest entity in China, which it currently controls through contractual arrangements (the "VIE structure"), has entered into a share transfer agreement to sell 5% equity interest of AirMedia Group Co., Ltd. ("AM Advertising") to Shenzhen Liantronics Co., Ltd, a company listed on the Shenzhen Stock Exchange (Shenzhen Stock Exchange Code: 300269) for a consideration of RMB 150 million in cash (the "Transaction"), which reflected the total valuation of AM Advertising of RMB3 billion.
>
> The payment of the Transaction is expected to be completed within 10 working days of the completion of the share transfer.
>
> AM Advertising is a consolidated affiliated entity of AirMedia. AirMedia will restructure AM Advertising for the Transaction. After the restructuring, AM Advertising will own and operate all AirMedia's media business in airports and all the billboard and LED media out of the airports, excluding gas station media network. After the restructuring, all AirMedia's other businesses, including but not limited to in-flight Wi-Fi business, on-train Wi-Fi business, digital TV-screens on airplanes, and gas station media network will be transferred out of AM Advertising and not form part of the Transaction.
>
> "Media companies have been enjoying higher PE multiples and valuation in China's local stock exchanges. We believe the Transaction is a good way to

> increase our shareholder value. We have made exciting developments on our transformation into a leading in-flight and on-train Wi-Fi operator in China. We will continue to focus on our transformation, which, we believe, has a brilliant future for the Company," remarked Herman Guo, chairman and chief executive officer of AirMedia.

57. The RMB150 million purchase price for 5% of AM Advertising was equivalent to $24.2 million. Thus, according to the press release, the Liantronics transaction implied a value for AM Advertising of RMB3 billion, or more than $480 million – approximately five times the market value of the entire Company the day before the announcement. Moreover, the press release conveyed the impression that the agreement was firm, with the only preconditions to the Company's receipt of payment being that it would restructure AM Advertising and effectuate the share transfer.

58. The statements set forth in the April 7, 2015 press release, which indicated that the sale of 5% equity in AM Advertising to Liantronics was a firm sale agreement without any strings attached, were false and misleading when made because Defendants knew or recklessly disregarded that, among other things: (i) Liantronics had not conducted necessary due diligence to provide comfort for such a purchase, but had merely regarded the transaction as a short-term loan with 10% interest; (ii) the sale of 5% equity in AM Advertising was subject to significant conditions, including Liantronics' willingness to consummate the deal without exercising its contractual right to walk away and AM Advertising's obligation to satisfy certain profit targets (described further below); (iii) AM Advertising could not realistically achieve the profit targets imposed by the equity transfer agreement, given the business' lackluster historical and current financial performance; and (iv) as a result, the valuation implied by the proposed 5% equity sale to Liantronics – RMB3 billion, or more than $480 million, and higher for the entire Company – was unreasonable, unrealistic and publicly communicated to artificially inflate the value of AM

Advertising and, by extension, the trading price of the ADRs, thereby substantially increasing the Company's market capitalization.

59. In response to this news, which investors received overwhelmingly favorably, the price of AirMedia's ADRs closed at $2.84 – an increase of 38.54% – the following day, April 8, 2015. In fact, the ADRs reached a three-year high of $3.70 during intraday trading on April 8, 2015 – when the press release was filed with the SEC as an attachment to Form 6-K – on unusually high trading volume of 14.23 million ADRs, as compared to only 95,000 ADRs trading on April 6, 2015.[5]

60. This news also led to further increases in the trading price and volume over the next two weeks, as the market continued to digest the implied valuation of the entire Company. In fact, an April 13, 2015 article published at *SeekingAlpha.com*, entitled "AirMedia Group Has 3 Potential Upside Catalysts," observed that the Liantronics transaction "implies that AirMedia Group is worth at least $9.43" per ADR, as follows:

> On April 7th, AirMedia Group announced that it would sell 5% of its ad unit to Shenzhen Liantronics for $24 million in cash. The deal values AirMedia's ad division at $480 million. Given that AirMedia has very little debt, $1.43 per share in cash, and a float of 59.6 million shares, the deal implies that AirMedia Group is worth at least $9.43 ($1.43 + $480/59.6) a share.

61. Ultimately, the ADRs closed at $4.62 on April 17, 2015, which represented an aggregate price increase of 90.1% between April 8 and 17, 2015. As noted, however, AirMedia did not disclose the terms of the contract when it announced the Liantronics transaction. Thus, it did not disclose that the contract entitled Liantronics to walk away from the deal at any time,

---

5 The average daily trading volume of the ADRs during the three years prior to the Class Period was 225,000 ADRs, compared with an average daily trading volume of 2,181,000 ADRs during the approximately two-month Class Period.

for any reason, after 75 calendar days (referred to as a "put option").[6] Nor did it disclose that it was required to pay Liantronics 10% of the purchase price per annum (*i.e.*, 10% of the annual funding cost) – on top of returning the purchase price – if Liantronics chose to abandon the transaction. And AirMedia continued to conceal the profit target imposed on AM Advertising, the satisfaction of which was a condition precedent to the consummation of the transaction.

62. The failure to disclose this and other information allowed the ADRs to reach a closing price of $5.00 by April 23, 2015, as investors believed that the Liantronics deal had no strings attached and supported an outsized valuation of the Company itself.

**B. The April 24, 2015 Statements**

63. Liantronics' walk-away right and 10% termination premium were not disclosed until April 24, 2015 – nearly three weeks after the April 7, 2015 announcement – when AirMedia filed its Form 20-F for FY 2014. Specifically, the Form 20-F provided, in pertinent part, the following description of the Liantronics transaction:

> In April 2015, Shengshi Lianhe entered into an agreement with Liantronics to transfer to Liantronics 5% equity interest in AM Advertising for RMB150 million. Liantronics agrees to make payments for the transfer after the change in AM Advertising's equity ownership is duly registered in government records. Before such change registration, we plan to consolidate certain media business lines under AM Advertising through internal re-organization. During the period of 75 calendar days after Shengshi Lianhe receives full payment from Liantronics, or the Waiting Period, we may elect to sell our equity interest in AM Advertising to third parties, and if we so elect, Shengshi Lianhe will repurchase such 5% equity interest from Liantronics for an amount equal to RMB150 million plus applicable fees. The applicable fees will be calculated as 10% of RMB150 million per annum for the period from the date on which Shengshi Lianhe receives Liantronics' full payment through the date on which such repurchase is completed. In addition, if we elect not to sell to third parties during the Waiting Period, Liantronics may request that Shengshi Lianhe repurchase such 5% equity

6 The Company also secured its own option to terminate the deal, which it could exercise if it found an alternate buyer for AM Advertising within 75 calendar days of receiving Liantronics' payment of the purchase price for 5% equity in AM Advertising. In that case, Liantronics would recover its purchase price and still be entitled to receive 10% on top of that amount.

> interest after the end of the Waiting Period. Repurchase price in this situation will equal to RMB150 million plus applicable fees, which will equal to 10% of RMB150 million per annum for the period from the date on which Shengshi Lianhe receives Liantronics' full payment through the date on which such repurchase is completed.

64. With the disclosure of these contractual provisions, investors began to realize that the 5% sale of AM Advertising was not a sale at all, but more akin to an agreement-to-agree at worst and a short-term loan at best. In response, the price of the ADRs traded as low as $4.57 in intraday trading and ultimately closed down 1% at $4.95, on higher-than-normal volume of 3.69 million ADRs traded. Accordingly, this partial disclosure adversely impacted the trading price, but the price remained artificially inflated as the full truth remained concealed.

65. In fact, by describing the transaction as involving a sale to Liantronics of 5% equity in AM Advertising, AirMedia continued to convey the misleading impression that the entirety of AM Advertising was worth approximately $480 million – a valuation far exceeding the actual worth of AM Advertising and, by extension, the Company. Moreover, Defendants continued to conceal the unrealistic profit target that the Liantronics contract imposed on AM Advertising as a condition precedent to closing the transaction.

66. Additionally, Defendant Guo signed the Form 20-F in his capacity as AirMedia's Chairman and CEO, expressly certifying that it meets all of the requirements for filing on Form 20-F. Furthermore, Guo and CFO Wu each signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which together conveyed the false impression that the Form 20-F contained all material information necessary to provide an accurate depiction of the Company's financial condition and prospects and material developments involving it.

67. Specifically, in their Section 302 Certifications, the Individual Defendants stated that the Form 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading with respect to the period covered by [it.]" They also represented that they had "disclosed . . . to the company's auditors and the audit committee of the company's board of directors . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

68. Likewise, in the Section 906 Certifications, the Individual Defendants stated that the Form 20-F "fully complies with the requirements of [Exchange Act] Section 13(a) or 15(d)" and that "[t]he information contained [therein] fairly presents, in all material respects, the financial condition and results of operations of the Company."

### C. Pearson's April 28, 2015 Report, AirMedia's April 29, 2015 Response and Pearson's April 30, 2015 Rebuttal

69. On April 28, 2015, only two trading days after the issuance of the FY 2014 Form 20-F (on April 24, 2015), Pearson, an individual specializing in Chinese investments who is also a regular Forbes contributor, issued a scathing report on AirMedia and its purported 5% sale transaction with Liantronics. The report, published at *SeekingAlpha.com* and entitled "AirMedia Doubles On Misleading Investment Transaction," attributed the rapid increase in the price of AirMedia ADRs "solely" to the Company's April 7, 2014 misleading announcement of the deal. According to Pearson, the terms of the actual contract, which had not previously been disclosed by AirMedia, not only dispelled the notion that AirMedia had sold – or struck a firm agreement to sell – 5% of AM Advertising's equity to Liantronics, but also undercut the notion that Liantronics had taken the steps necessary to finalize the deal. Indeed, as Pearson wrote: "AirMedia has no deal."

70. Specifically, in his report, Pearson described the salient terms of the Liantronics contract, a description of which he obtained from an announcement written in Chinese available

at Liantronics' website. He also included a link in his report to the Chinese version and English translation of the announcement.

71. In addition to the walk-away and 10% premium provisions, Pearson indicated that the agreement imposed a profit target on which the valuation of the 5% equity stake in AM Advertising, and AirMedia's representation regarding the valuation of all of AM Advertising, were based. As he explained, the contract required AM Advertising to report an audited profit in FY 2015 of RMB200 million, or nearly $31 million. But as Pearson observed, the odds of achieving the target were "basically zero," and the need for audited results would delay the deal. Of course, AM Advertising's inability (or failure) to satisfy these conditions would undoubtedly prompt Liantronics to exercise its termination right, further underscoring the illusory nature of the transaction.

72. If nothing else, the prior financial performance of AirMedia and AM Advertising underscored the unrealistic nature of this profit target. Indeed, AirMedia had lost money for the previous six years, and its business had shown continuous revenue declines. The gross profit for the entire AM Advertising business - including the airport, other advertising and Wi-Fi lines – came to just $10 million per quarter before selling, general and administrative expenses ("SG&A") and other operating expenses. In the fourth quarter of 2014, SG&A alone was $15 million - more than all projected gross profit. Moreover, for full-year 2014, the gross profit for the entire Company was only $16.6 million. In contrast, the Company's selling and marketing expenses were $25 million, general and administrative expenses were $26 million, and operating losses were $35 million. After adjustments, net losses to AirMedia shareholders came to $26 million.

73. Additionally, the Liantronics deal was contingent on AirMedia's restructuring of AM Advertising by, among other things, removing the in-flight and on-train Wi-Fi businesses, gas station media network, and certain other businesses (described in the April 7, 2015 press release), eliminating avenues of revenue and potential profit for AirMedia. Further, as Pearson noted, nearly 50% of the concessions earmarked for AM Advertising were expiring by the end of 2015, which, he believed, would also prevent Liantronics from consummating the purchase.

74. In fact, Pearson indicated that, based on his own investigation, Liantronics had not conducted due diligence or reviewed non-public information on AM Advertising. Indeed, as he stated, representatives of Liantronics confirmed that it had not done so and that the deal remained in its initial stages – facts that further undermined the prospect that the agreement was binding or that *Liantronics* somehow believed the $31 million profit target was realistic.

75. The next day, April 29, 2015, AirMedia responded. In an unusual press release entitled "AirMedia Responds to False Allegations," the Company tried to undermine Pearson's article by rejecting out-of-hand – in a purported letter to shareholders from CEO Guo, contained in the press release – the notion that the Liantronics contract was illusory and non-binding. But it did not dispute Pearson's translation or interpretation of the contract.

76. Instead, in the opening paragraph of the press release, AirMedia stated that "[it] believes that the allegations and accusations set forth in the article are false and inaccurate and contain numerous errors of facts, misleading speculations and malicious interpretations of events." And notwithstanding Pearson's observation that the contract was not binding or likely to be performed, the Company and Guo continued to represent that the Liantronics transaction represented a firm and completed sale of 5% equity in AM Advertising – instead of a potential, and uncertain, agreement-to-agree.

77. In fact, Guo characterized the transaction as "arms-length and serious," while purporting to explain that AirMedia intended to exit the advertising business and exclusively become a Wi-Fi operator. His letter, featured in the press release, provided, in part, as follows:

> Letter from the CEO
>
> Dear shareholders,
>
> Before clarifying the facts, first, I would like to share with you my thoughts and motivation behind the transaction we announced on April 7, 2015 (the "Transaction") to sell 5% equity interest of our PRC affiliated entity, AirMedia Group Co., Ltd. ("AM Advertising") to Shenzhen Liantronics Co., Ltd. ("Liantronics"). As you know, we endeavor to transform into a leading in-flight and on-train Wi-Fi operator in China. We believe our Wi-Fi business will have tremendous growth and monetization potential when hundreds of millions of passengers use our Wi-Fi services when they travel. As for our current advertising business, we noted the wide valuation gap between China's local stock exchanges and U.S. stock exchanges and would like to capitalize on the sale of our advertising business at a much more attractive valuation to companies in China. We intend to sell the remaining equity interests of our advertising business in the foreseeable future so that we can focus our resources on the exciting Wi-Fi business.
>
> AirMedia and Liantronics are listed companies in the United States and China, respectively. The Transaction between the two companies is arms-length and serious.

78. Additionally, Guo attempted to counter Pearson's allegation that Liantronics did not perform due diligence – a fact that Liantronics itself had confirmed to Pearson – by claiming that Liantronics had hired advisers, stating as follows:

> The claim that Liantronics has not even conducted due diligence in connection with the Transaction is erroneous. In contrary, Liantronics engaged a major PRC accounting firm, a recognized PRC law firm, a qualified PRC assets appraisal company and a recognized PRC financial advisory firm to conduct due diligence of AM Advertising in March 2015.

79. Next, Guo described the walk-away provisions that Liantronics and AirMedia each secured as part of the transaction – the very provisions that made the contract illusory and non-binding in the first place. Specifically, he described the provisions as follows:

> In connection with the Transaction, we requested and have obtained a call option which provides that "during the period of 75 calendar days after Shengshi Lianhe receives full payment from Liantronics (the "Waiting Period"), we may elect to sell our equity interest in AM Advertising to third parties, and if we so elect, Shengshi Lianhe will repurchase such 5% equity interest from Liantronics for an amount equal to RMB150 million plus applicable fees." Several unrelated parties have expressed interest in buying equity interests of our advertising business and we would like to preserve the ability to evaluate other potential offers and enter into transactions with the party or parties that will give us the most satisfactory terms.
>
> In exchange for our call option, Liantronics requested and has obtained a put option to revoke the Transaction after the expiration of the Waiting Period.

80. And in an attempt to instill investor confidence in the purported likelihood that the transaction involving Liantronics would be successfully completed, Guo made a generic yet thinly-veiled reference to the prospect of satisfying the profit target imposed by the agreement. Specifically, he referenced the businesses that AM Advertising would retain for the purposes of the transaction, and confirmed management's purported expectation that those businesses would remain profitable throughout 2015, as follows:

> Although AirMedia had consolidated net loss, our stand-alone digital frames, mega-size LED screens, traditional media in airports and unipole sign and other outdoor media out of airports, which will be the business lines left in AM Advertising after we sell the advertising business, have been profitable for years and we believe they will continue to be profitable in 2015.

81. Accordingly, Guo confirmed that AM Advertising's restructuring – which was a required condition of the transaction – required AM Advertising to retain businesses involving "stand-alone digital frames, mega-size LED screens, traditional media in airports and unipole sign and other outdoor media out of airports," which he claimed "have been profitable for years and . . . will continue to be profitable in 2015."[7] Thus, although he did not mention (or deny)

---

[7] In the April 7, 2015 press release (described above), AirMedia indicated that, "[a]fter the restructuring, AM Advertising will own and operate all AirMedia's media business in airports and all the billboard and LED media out of the airports, excluding gas station media network." In contrast, "AirMedia's other businesses, including but not limited to in-flight Wi-Fi business,

the $31 million profit target for FY 2015 noted in Pearson's article, Guo nevertheless provided comfort to investors that AM Advertising would achieve that target.

82. The statements set forth in the April 29, 2015 press release, which represented that the transaction involving Liantronics was "arms-length and serious," and that Liantronics had conducted due diligence, were false and misleading when made because Defendants knew or recklessly disregarded that, in fact, the transaction was at its inception and Liantronics had not conducted adequate due diligence to provide comfort that AM Advertising would meet the profit target for FY 2015. Likewise, statements conveying the impression that the profit target was achievable were false and misleading when made because Defendants knew or recklessly disregarded that AM Advertising's historical, current and projected financial performance rendered that target unrealistic and unlikely to be achieved. As a result of the foregoing, statements perpetuating the impression that AM Advertising had an implied valuation of nearly $480 million – ostensibly, the sole objective of the press release, which responded to Pearson's criticisms – were also false and misleading when made, because the transaction was illusory and unlikely to ever close.

83. In response to Pearson's article and AirMedia's response, the price of the ADRs immediately declined by 11.29%, to close at $4.48, on April 29, 2015 – the date of AirMedia's press release. In fact, even when Pearson issued his article on April 28, 2015, the ADRs traded as low as $4.18 on unusually high trading volume of nearly 6.9 million ADRs. Nevertheless, Defendants' denials ensured that the trading price of the ADRs remained artificially inflated, as the full truth concerning the fraud remained at least partially concealed.

---

on-train Wi-Fi business, digital TV-screens on airplanes, and gas station media network will be transferred out of AM Advertising and not form part of the Transaction."

84. Subsequently, on April 30, 2015, Pearson published a follow-up article entitled "Why Is AirMedia Falling?" In the article, he concluded that AirMedia's press release from the previous day confirmed that "a) there is no deal; and b) new (and potentially greater) issues of concern have been revealed," largely because the Company did not refute the primary points of his April 28, 2015 article. Indeed, Pearson's new article indicated, among other things, that:

- On the same day (April 7, 2015) that AirMedia publicly disclosed the AM Advertising transaction, Liantronics said it had *completed* due diligence on a transaction involving Shenzhen Precise Focus Media, in contrast to the AM Advertising deal for which it had not completed diligence;

- AirMedia still failed to disclose the $31 million profit target and "notably stopped short of saying anything about [it] . . . as the basis for pricing" the Liantronics transaction;

- AirMedia claimed that AM Advertising would be profitable once divested of certain money-losing businesses, such as airport digital TV screens, but those businesses accounted for an exceedingly small percentage of revenue;

- The existence of Liantronics' put option undermined the representation that the contract was binding and the sale was a done deal; and

- AirMedia's planned exit from the advertising business represented a tacit, if not express, acknowledgement that it was losing money and would continue to do so, also undermining the likelihood that Liantronics would close the deal.

85. Two trading days later, on May 4, 2015, AirMedia filed with the SEC the April 29, 2015 press release as an attachment to Form 6-K. As the market digested the revelations in Pearson's April 30, 2015 article, however, the price of the ADRs declined significantly – falling by 5.94%, to close at $4.43, on May 4, 2015; and by 11.06%, to close at $3.94, on May 5, 2015.

**D. The May 18, 2015 Statements and Investor Conference Call**

86. On May 18, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015. As compared to the first quarter of 2014: total revenues were $61 million, down 3.8%; revenue from DFiAP was $56.1 million, a decline

of 9.2%; revenue from traditional media in airports declined to $13.2 million, 9.8% lower; and revenue from the gas station media network was $2.2 million, an 18.3% drop. Only "other revenues in air travel" experienced positive growth, increasing to $5.4 million due to earnings derived from divesting certain operations. Net loss attributable to AirMedia's shareholders was $5.7 million – a substantial increase from the first quarter of 2014 – even as total operating expenses declined significantly from the same period the prior year.

87. Commenting on the Liantronics transaction, CEO Guo continued to emphasize the valuation of AM Advertising while reinforcing the message that the deal was binding, on track (insofar as the required restructuring of AM Advertising was underway), and the first step in divesting the Company of its advertising business. Specifically, the press release provided, in pertinent part, as follows:

> As you know, we endeavor to transform into a leading in-flight and on-train Wi-Fi operator in China. We would like to capitalize on the sale of our advertising business at a much more attractive valuation to companies in China so that we can focus our resources on the exciting Wi-Fi business. We are excited about the agreement with Shenzhen Liantronics Co., Ltd. to sell 5% equity interest of our advertising business for a consideration of RMB150 million in cash. We intend to sell the remaining equity interest of our advertising business in the foreseeable future. We are in the process of restructuring our advertising business according to the aforementioned agreement. Meanwhile, we are also discussing with other unrelated third parties who expressed interest in buying our advertising business, commented Mr. Herman Guo, chairman and chief executive officer of AirMedia.

88. In turn, CFO Wu commented that the "intended sale of our advertising business is expected to strengthen our cash position and provide capital support for our new Wi-Fi businesses[.]"

89. Later that day, AirMedia held an analyst and investor conference call regarding its first quarter financial results, in which the Individual Defendants discussed the status of the Liantronics deal and the valuation of AM Advertising. In his opening remarks, Guo repeated his statements from the press release practically verbatim, as follows:

As you know, we endeavor to transform into a leading in-flight and on-train Wi-Fi operator in China. As for our current advertising business, we noticed the wide valuation gap between China's local stock exchanges and the U.S. stock exchanges and would like to capitalize on the sale of our advertising business at a much more attractive valuation to companies in China, so that we can focus our resources on the exciting Wi-Fi business. We are excited about the agreement with Shenzhen Liantronics Company Limited to sell 5% of the equity interest of our advertising business for a consideration of RMB150 million in cash. We are in the process of restructuring our advertising business according to the aforementioned agreement.

We also intended to sell the remaining equity interest of our advertising business in the foreseeable future and [are] in discussion with potential buyers. In the transaction with Liantronics, we obtained a call option to reserve the ability to evaluate other potential offers and enter into – in transactions with the party or parties that will give us the most satisfactory terms. Several unrelated parties have expressed the interest in buying equity interest of our advertising business.

90. Likewise, in his own opening remarks, Wu repeated verbatim his statement from the earnings press release, noting: "Our intended sale of our advertising business is expected to strengthen our cash position and provide capital support for our new Wi-Fi businesses."

91. During the question-and-answer session after the opening remarks, both analysts on the call asked about the sale of the remainder of the advertising business. In response to a question regarding the timing of a sale, Wu echoed Guo's earlier comments, implying that the outsized valuation associated with the Liantronics deal – as well as a sale of the remainder of the business – was then justified by "leveraging" the purported valuation gap between U.S. and China stock market valuations, as the following excerpt from the exchange reflects:

**Xin Wang, Analyst**

[Y]ou mentioned that you will sell the remaining advertising business in the foreseeable future to focus on Wi-Fi business. So, may I know your thoughts on the timing? Like will you wait for an attractive valuation, or when your Wi-Fi business revenue is big enough to maintain comparatively stable overall revenue size, and then gradually sell the remaining outdoor advertising business?

**Richard Wu, Chief Financial Officer**

> [Y]eah, basically this is a decision by the Board of AirMedia to basically divest our existing advertising business, leveraging on the valuation gap between U.S. and China stock markets valuations. And in terms of the switch to the Wi-Fi business, also it's a decided direction which we have been aggressively tapping our new concession rights contracts, as you can see from time-to-time we do have new basically high risk in the resource development area.
>
> And on the revenue in terms of the ramping up and growing of that, I think it's two separate decisions that a Board of AirMedia have decided to pursue simultaneously and, we will now wait until our Wi-Fi revenue size grows to a certain sizable, yes, stage. No, that's two separate the [sic] directions that we are aggressively pursuing at this time.

92. In response to a question from the other analyst, Wu represented that AirMedia intended to sell more than 50% of the remaining equity of the advertising business for cash, as the following excerpt from the exchange reflects:

**Wei Fang, Analyst**

> [R]egarding the sale of your equity interest, just follow up the previous question. I'm still wondering, how much do you – can you or maybe are you willing to sell? Not sure if it can reach to 50% of your shares?

**Richard Wu, Chief Financial Officer**

> [W]e have decided to sell more than 50% equity interest of our advertising business for the cash, the cash portion that's a minimum requirement of Board, expectation for us. And as for the remaining portion, we are flexible in getting equity of the counterparty, hopefully to generate a high return going forward.

**Wei Fang, Analyst**

> Okay. Got that. So let me just clarify. So you're willing to sell more than 50% of your shares for cash, right?

**Richard Wu, Chief Financial Officer**

> Yeah, for the cash portion, yes. Right.

**Wei Fang, Analyst**

> And in case there are interested parties, they want to invest with both cash and equity, you – that's not your priority, you want to put the priority on cash first, right? Cash transaction?

**Richard Wu, Chief Financial Officer**

Yes. That's correct.

93. The statements made in the May 18, 2015 earnings release and call concerning the valuation and status of the Liantronics transaction, as well as the consideration sought for the remaining portion of the advertising business, were knowingly and/or recklessly false and misleading when made. For example, it was misleading for Guo and Wu to represent that the Company was exploiting a supposed stock market valuation gap, when the price associated with the Liantronics transaction was unrealistic and the conditions precedent to closing the deal were unlikely to occur. By continuing to state that the Company sought to sell the *remaining* portion of the advertising business, they also conveyed the misleading impression that the Liantronics deal was proceeding on track.

94. Likewise, by stating that the Company sought at least 50% cash for the rest of the advertising business, but was "flexible in getting equity of the counterparty, hopefully to generate a high return going forward," Wu perpetuated the false and misleading impression that: (i) any sale would involve consideration with a value equivalent to the valuation implied by the Liantronics transaction, which involved the sale of only 5% of AM Advertising's equity; (ii) management expected to secure a cash buyer for the majority of the remaining business; and (iii) the advertising business was not only deserving of the inflated valuation associated with the Liantronics deal, but was also *profitable* and would achieve any profit targets imposed on a sale – conclusions engendered by Wu's representation that the Company would accept equity of any "counterparty" to a sale of the business (*i.e.*, acquirer) in order to share in the purportedly "high return going forward."

95. In response to Defendants' representations on May 18, 2015, which continued to conceal the truth regarding the valuation of AM Advertising and AirMedia's own prospects and

introduced new falsehoods into the market, the price of the ADRs increased dramatically. In fact, on May 19, 2015, the next trading day, the price of the ADRs increased by 12.34% to close at $6.19 on unusually high trading volume of 3.24 million ADRs.

96. Reporting on this increase and the news at least partially responsible for it, *MT Newswires* published a report on May 19, 2015 entitled "AirMedia Reverses Pre-Market Loss to Hit 4-Yr High On Planned Advertising Unit Sale," stating, in pertinent part, as follows:

> AirMedia Group shares rose to their highest level since early 2011 on Tuesday, reversing pre-market losses, after the operator of out-of-home advertising platforms in China said it plans to sell the remaining equity interest in its advertising business in the foreseeable future. AMCN was down nearly 7% before the market opened amid a wider Q1 loss and a decline in revenue. By mid-afternoon, the stock was up over 17% at $6.44, having earlier hit a new high of $6.57. The 52-week low is at $1.65. AirMedia said that following its April sale of a 5% stake in the advertising business to Shenzhen Liantronics Co. for RMB150 million ($24.5 million), it now plans to sell the remainder of that business. "We are in the process of restructuring our advertising business according to the aforementioned agreement," CEO Herman Guo said in a statement. "Meanwhile, we are also discussing with other unrelated third parties who expressed interest in buying our advertising business."

97. For nearly a month thereafter, the trading price of the ADRs continued to climb as the market expected the Company to announce a sale of the remainder of AM Advertising at a valuation akin to that associated with the Liantronics deal. Ultimately, the trading price of the ADRs reached a closing price of $7.26 on June 12, 2015 – nearly 43% higher than the price on May 15, 2015, the trading day immediately preceding the announcement and conference call regarding AirMedia's first quarter results; and 274% higher than the price on April 6, 2015, the trading day immediately preceding the initial announcement of the purported Liantronics deal.

### E. The June 15, 2015 Statements and Announcement of the Sale of 75% Equity in AM Advertising for a Lower Implied Value

98. The Class Period ends on June 15, 2015. On that date, AirMedia issued a press release announcing a definitive agreement to sell a 75% equity interest in AM Advertising to

Longde Wenchuang for RMB2.1 billion in cash (or $338 million), which supposedly reflected a total valuation for AM Advertising of RMB2.8 billion (or $451 million) after the completion of its restructuring (at an exchange rate of $1 = RMB6.2066 on that date). As "actual controller of AM Advertising under PRC law," Guo was a party to the agreement. The press release described the new transaction, in pertinent part, as follows:

> AirMedia Group Inc. ("AirMedia" or the "Company") (Nasdaq: AMCN), a leading operator of out-of-home advertising platforms in China targeting mid-to-high-end consumers, as well as a first-mover in the in-flight and on-train Wi-Fi market, today announced that the Company, AirMedia Technology (Beijing) Co., Ltd., which is a wholly owned subsidiary of the Company in China, Beijing AirMedia Shengshi Advertising Co., Ltd. (the "Seller"), formerly known as Beijing Shengshi Lianhe Advertising Co., Ltd., which is AirMedia's variable interest entity ("VIE") in China as well as the controlling shareholder of AirMedia Group Co., Ltd. ("AM Advertising"), and Mr. Herman Guo, who is deemed as actual controller of AM Advertising under PRC law have entered into a definitive equity interest transfer agreement (the "Agreement") with Beijing Longde Wenchuang Fund Management Co., Ltd. ("Longde Wenchuang" or the "Buyer") to sell 75% equity interest of AM Advertising (the "Transaction") for a consideration of RMB2.1 billion in cash (the "Consideration"), which reflected the total valuation of AM Advertising of RMB2.8 billion after the completion of the restructuring.

99. The press release indicated that post-restructuring, AM Advertising "is expected to own and operate all AirMedia's media business in airports (excluding Digital TV screens in airports and TV-attached digital frames) and all the billboard and LED media outside of airports (excluding gas station media network and digital TV screens on airplanes)[.]"

100. By contrast, all of AirMedia's other businesses – including the in-flight Wi-Fi, on-train Wi-Fi, digital TV screens on airplanes, and gas station media businesses – would be transferred out of AM Advertising and excluded from the transaction.

101. In the press release, AirMedia also disclosed that the consideration payable in the new transaction would be made in two installments, as follows:

- *first*, RMB800 million is/was payable within 15 working days after the completion of AM Advertising's restructuring and the procurement of employment agreements with key AM Advertising employees; and
- *second*, RMB1.3 billion is/was payable within 15 working days after the later to occur of, among other things, the termination of the Liantronics deal and removal of the VIE structure for AM Advertising.

102. Additionally, the controlling shareholder of AM Advertising, Shengshi Lianhe – an entity substantially owned and controlled by Guo – "guarantee[d] that the preconditions to the second installment shall be fulfilled no later than September 30, 2015." Incidentally, the Company indicated that one of those preconditions – termination of the Liantronics transaction – would be easy to satisfy, given its admission in the press release that "[a]s [of] the time of the execution of the [new] [a]greement, AirMedia has not transferred the 5% equity interest [in] AM Advertising to Liantronics."

103. Critically, however, the new transaction subjects AM Advertising to even more onerous, lengthy and unachievable profit targets than the Liantronics transaction, in the form of a four-year earnout structure, described in the press release as follows:

> The Agreement contains an earnout structure, in the event that the net profit (before or after adjustment for non-recurring gains and losses, whichever is less) of restructured AM Advertising in each of the fiscal years of 2015, 2016, 2017, and 2018 (collectively, the "Covered Period") is less than the profit target of RMB1.0592 billion (the "Profit Target") (being RMB200 million, RMB240 million, RMB288 million and RMB331.2 million for the fiscal years of 2015, 2016, 2017, and 2018 respectively), other shareholders of AM Advertising, excluding the Buyer, will be obligated to compensate the Buyer for the deficiency by transferring their equity interest in AM Advertising to the Buyer for nil consideration and/or by cash, based on a pre-determined formula with such compensations in aggregate being subject to a cap equal to the amount of the Consideration.

104. Consequently, if AM Advertising does not achieve the earnout provision's net profit targets of $32.2 million in FY 2015, $38.7 million in FY 2016, $46.4 million in FY 2017,

or $53.4 million in FY 2018, Longde Wenchuang is entitled to ownership of the remaining 25% of AM Advertising for free, *or* a cash payment by the sellers capped at RMB2.1 billion.

105. As Guo indicated in the press release, however, the so-called "target" businesses – which AM Advertising was slated to own after the restructuring – only "generated net profit of approximately RMB134 million (US$21.59 million) in 2014 on a pro forma basis." Although he expressed optimism on AM Advertising's prospect of achieving the targets anyway – stating "We are confident that AM Advertising will be able to achieve the profit target in the earnout" – the possibility (much less probability) of meeting (or exceeding) such lofty targets is virtually nil. Indeed, AirMedia's *gross* profit for *all of its businesses* in FY 2014 was only $16.6 million – slightly greater than half (51.6%) of the new transaction's net profit target for FY 2015. And AirMedia's *net loss* attributable to shareholders in FY 2014 was $26 million.

106. Given the unlikelihood that AM Advertising will achieve these profit targets, it is likely that AirMedia and the other owners will forfeit their remaining 25% interest to Longde Wenchuang. Thus, the new transaction actually implies a significantly lower valuation for AM Advertising than the purported deal with Liantronics, because the purchase price of the new deal – $338 million – does not merely reflect consideration for 75% of AM Advertising, but instead reflects consideration for 100% of it. In contrast, using the end-of-Class Period exchange rate, the Liantronics transaction implied a value of $483 million for the entirety of AM Advertising. Accordingly, the new transaction actually values AM Advertising at least $145 million less than the prior deal – a figure that is 30% lower than the value implied by the Liantronics transaction, which value Defendants tirelessly promoted throughout the Class Period.

107. Confronted with this information, investors finally learned the full truth. Indeed, the June 15, 2015 press release definitively revealed for the first time that, among other things:

(i) management, including Defendants, never believed AM Advertising was worth the valuation ascribed to it in the Liantronics deal; (ii) AirMedia had not performed – and never intended to perform – the Liantronics contract; (iii) AM Advertising could never achieve the profit targets imposed in the respective transactions; and (iv) given the inflated valuation of AM Advertising, *AirMedia's* valuation and market capitalization were likewise inflated.

108. In response to these revelations, the price of AirMedia's ADRs – which opened at $7.62 and climbed as high as $7.70 in intraday trading that day (June 15, 2015) – declined by nearly 17.8% to close at $5.97 on unusually high volume of 6.18 million ADRs traded. As the market continued to digest this information over the next three trading days (the Form 6-K attaching the press release was publicly filed with the SEC on June 17, 2015), the trading price fell even further. Indeed, on June 16, 2015, the price declined by 4.36% to close at $5.71; on June 17, 2015, the price declined by 18.91% to close at $4.63; and on June 18, 2015, the price declined by 23.97% to close at $3.52.

109. All told, the trading price of the ADRs dropped $3.74 from the $7.26 closing price on June 12, 2015 (the trading day before the end-of-Class Period press release) and June 18, 2015 (when the truth was fully reflected in the market price), representing a total decline of nearly 52% – instantly erasing approximately $220 million in AirMedia's market capitalization.

## LOSS CAUSATION

110. During the Class Period, Defendants misled the investing public by issuing false and misleading statements and failing to disclose material facts necessary to render such statements non-misleading, which artificially inflated the trading price of the ADRs. These statements and omissions failed to disclose material adverse information and misrepresented the truth about the Company and its business, prospects and valuation, as alleged herein. And these statements and omissions had their intended effect of preventing the market from learning the

truth about AM Advertising's value and the other material matters described herein, thereby sustaining the artificially inflated ADR price throughout the Class Period.

111. Accordingly, during the Class Period, the trading price of the ADRs increased as Defendants disseminated their false and misleading statements and declined as the truth was revealed, reflecting the dissipation of the artificial inflation and causing damages to Plaintiff and the other members of the Class. The market's reaction to this information is demonstrated in the following chart:




112. The rapid rise and decline in AirMedia's ADR price was the direct result of the nature and extent of the misrepresentations made to investors. Thus, the revelation of the truth during the Class Period, as well as the resulting market reaction and ADR trading price, confirm that the market appreciated the exposure of the truth as it occurred.

113. Consequently, the material misrepresentations and omissions alleged directly or proximately caused, or were a substantial contributing cause of, damages sustained by Plaintiff

and the other members of the Class. Indeed, these materially false and misleading statements caused Plaintiff and the other members of the Class to purchase AirMedia ADRs at artificially inflated prices, causing the damages complained of herein. Were it not for such materially false and misleading statements and omissions, Plaintiff and the other members of the Class would not have purchased ADRs at their artificially inflated prices or perhaps at all.

## ADDITIONAL SCIENTER ALLEGATIONS

114. As alleged herein, CEO Guo signed the agreements to convey ownership of AM Advertising not only because of his affiliation with AirMedia, but, because he owns and/or controls substantial interests in AirMedia, AM Advertising and Shengshi Lianhe. Moreover, as CEO and CFO, the Individual Defendants purportedly negotiated the agreements themselves or were heavily involved in the negotiations. Additionally, the Individual Defendants frequently spoke about, or approved the dissemination of, information regarding AirMedia's business and the Class Period transactions that contemplated the sale of equity interests in AM Advertising. As such, they were indisputably aware of the terms of the contracts, including the preconditions to the respective transactions.

115. As CEO and CFO, the Individual Defendants also knew the filing requirements imposed by the SEC, including with respect to Forms 20-F and 6-K, which AirMedia filed throughout the Class Period. Specifically, the rules and regulations governing the preparation of these filings require the issuer to promptly disclose material information regarding the sale of assets or other material transactions. Additionally, it is customary for foreign issuers, much like domestic issuers, to attach copies of material contracts to their Forms 20-F and 6-K.

116. Nevertheless, AirMedia failed to disclose key terms of the Liantronics contract in the April 8, 2015 Form 6-K, including Liantronics' put option, the Company's own walk-away option, and the contractual provision imposing a $31 million profit target on AM Advertising

for FY 2015. Moreover, at no time did the Company publicly file a copy of the contract as an attachment to Form 6-K or Form 20-F. Yet the Company publicly filed copies of other material agreements, including contracts associated with – but not memorializing – the Liantronics deal. For example, AirMedia attached to the FY 2014 Form 20-F copies of: (i) the April 7, 2015 Supplementary Agreement to the Amended and Restated Equity Pledge Agreement; and (ii) the April 7, 2015 Supplementary Agreement to the Amended and Restated Call Option Agreement.

117. Additionally, AirMedia filed as attachments to its FY 2014 Form 20-F English translations of material agreements involving facets of its business, such as the August 22, 2014 English Summary of Franchising Operation Agreement of Wi-Fi Wireless Network On Bullet Trains Administered under Shanghai Railway Administration. Moreover, the FY 2014 Form 20-F, like other Forms 20-F that AirMedia previously filed, incorporated by reference material contracts (including English translations) that the Company had attached to prior SEC filings. Indeed, the FY 2014 Form 20-F alone referenced nearly 50 such translated contracts. Yet the Company did not publicly file a translated copy of the Liantronics contract or otherwise provide a complete and accurate description of its terms and conditions.

118. Further, even when the Company described the walk-away rights associated with the Liantronics agreement in its FY 2014 Form 20-F, it did not disclose the $31 million profit target imposed on AM Advertising for FY 2015. Rather, it took Pearson's April 28, 2015 report to expose the existence of the target. The absence of this information rendered the April 8, 2015 Form 6-K (as well as the April 7, 2015 press release) and the FY 2014 Form 20-F false and/or materially misleading.

119. Given the Individual Defendants' personal knowledge of AirMedia's disclosure obligations, as well as their personal involvement in ensuring the discharge of such duties and

the decision to disclose or withhold information from the Company's public filings, the failure to disclose or fairly describe the Liantronics contract is highly suggestive of conscious disregard or recklessness.

120. Moreover, while in possession of non-public, adverse information regarding the proposed transaction with Liantronics and the Company's prospects and financial condition, several insiders – including Defendant Wu – expressed an intention to sell a substantial amount of their personally held ADRs immediately preceding the disclosure of the truth, at some of the highest trading prices during the Class Period. Specifically, these insiders – CFO Wu; President and director Zhonghua Feng ("Feng"); Divisional Vice President of Sales Aaron Ting Pan Tsoi ("Tsoi"); and Chief Public Relations Officer Wei He ("He") – submitted Forms 144 to the SEC evidencing their intention to sell nearly 1.3 million ADRs, for aggregate proceeds exceeding $9 million, from June 2 to 15, 2015. The following chart summarizes the Form-144 submissions during the Class Period:

| Name | Transaction Date | # Shares | Price Per ADR | Total Value |
|---|---|---|---|---|
| Feng | June 2, 2015 | 812,757 | $6.95 | $5.6 million |
| Defendant Wu | June 11, 2015 | 212,768 | $6.96 | $1.5 million |
| Tsoi | June 15, 2015 | 90,000 | $7.26 | $653,000 |
| He | June 15, 2015 | 173,000 | $7.26 | $1.3 million |
| | **Totals:** | **1,288,525** | **$7.03 (avg.)** | **$9.053 million** |

121. According to the SEC: "A person filing a Form 144 must have a bona fide intention to sell the securities referred to in the Form within a reasonable time after the filing of the Form." Thus, when these insiders submitted their Forms 144 to the SEC, they had a bona fide intention to sell their holdings in AirMedia.

122. It is highly suspicious that numerous top executives would indicate their intent to sell large amounts of AirMedia ADRs on or near the eve of announcing the sale of 75% of AM Advertising to Longde Wenchuang, suggesting, among other things, that: (i) they knew that the

price of AirMedia's ADRs was artificially inflated; (ii) they were in possession of non-public, adverse information concerning the Company, including AM Advertising; and (iii) they acted to take personal advantage of the overvaluation of their ADRs in advance of the Company's June 15, 2015 announcement and the concomitant disclosure of the full truth.

123. Further, the planned securities transactions are suspicious in timing and amount. At an average price of over $7 per ADR, such sales would take advantage of the highest prices for AirMedia ADRs in years. In fact, before the Class Period, AirMedia ADRs were trading at less than $2 each and had not traded above $6 per ADR since March 2011. On information and belief, these are the only Forms 144 reportedly submitted to the SEC by AirMedia executives in at least the 12 month-period preceding the Class Period.

124. The intended sales reflected in the Forms 144 also confirm each seller's intent to divest a substantial portion of their personal holdings of AirMedia ADRs. For example:

- Wu intended to sell 212,768 ADRs (or the equivalent), representative of 425,536 ordinary shares. According to the FY 2014 Form 20-F, he held less than 1% of AirMedia's outstanding ordinary shares as of March 31, 2015, meaning that he held fewer than 1.2 million ordinary shares. Thus, he intended to sell a minimum of 35.5% of his holdings.
- Feng intended to sell 812,757 ADRs (or the equivalent), representative of 1,625,514 ordinary shares. According to the FY 2014 Form 20-F, he held 4,682,324 ordinary shares as of March 31, 2015. Thus, he intended to sell approximately 34.7% of his holdings.
- He intended to sell 173,000 ADRs (or the equivalent), representative of 346,000 ordinary shares. Because He held less than 1% (or 1.2 million) of AirMedia's ordinary shares, He intended to sell a minimum of 28.8% of his holdings.
- Tsoi intended to sell 90,000 ADRs (or the equivalent), representative of 180,000 ordinary shares. Because Tsoi held less than 1% (or 1.2 million) of AirMedia's ordinary shares, he intended to sell a minimum of 15% of his holdings.

125. Accordingly, Wu's expressed intent to sell his ADRs at artificially inflated prices at unusual and suspicious times in unusual and suspicious amounts supports a strong inference that he acted with scienter in disseminating false and misleading information during the Class Period. Furthermore, the nature, timing and amount of the intended sales by the other insiders referenced herein are also indicative of AirMedia's scienter, because the sales reflect an attempt to capitalize on non-public, adverse information to which they and other insiders were privy.

**PRESUMPTION OF RELIANCE**

126. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact which there was a duty to disclose. Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's purported agreement with Liantronics and the supposed implied valuation of AM Advertising, including the existence of significant undisclosed contingencies to the agreement.

127. Plaintiff also is entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for AirMedia's publicly-traded securities was open, well-developed and efficient at all times during the Class Period. As a result of the materially false and misleading statements alleged herein, AirMedia's ADRs traded at artificially inflated prices during the Class Period. Further, Plaintiff and other members of the Class purchased the ADRs in reliance on the integrity of the market price of the ADRs and the market information relating to AirMedia, and were damaged thereby.

128. At all relevant times, the market for AirMedia's ADRs was an efficient market for the following reasons, among others:

(a) AirMedia's ADRs met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) AirMedia is and was subject to periodic reporting and other disclosure requirements of the Exchange Act as a foreign private issuer, including the requirement that it file reports and other information with the SEC;

(c) AirMedia regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and similar reporting services; and

(d) AirMedia was followed by securities analysts employed by brokerage firms, including BuySellSignals Research, ICB International Research Ltd., BOC International and CLSA, which issued research reports distributed to the brokerage firms' sales force and the public. Each of these reports was publicly available and entered the public marketplace.

129. As a result of the foregoing, the market for AirMedia's ADRs promptly digested current information regarding AirMedia from all publicly available sources and reflected such information in the trading prices of the ADRs.

130. Under these circumstances, all purchasers of AirMedia's ADRs during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices and a presumption of reliance applies.

131. At the times they purchased AirMedia's ADRs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

132. In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and the other members of the Class purchased the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

**NO SAFE HARBOR**

133. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Indeed, the risk warnings that may have been provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

134. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those statements was made, the speaker knew that it was materially false or misleading; and/or the statement was authorized and/or

approved by an executive officer of AirMedia who knew that those statements were materially false and/or misleading when made.

135. Further, to the extent that Defendants made any disclosures purportedly intended to warn or caution investors of certain risks, those disclosures were also false and misleading, because they did not disclose that Defendants were engaging in the conduct – or putting in motion events that would cause the risks to materialize – about which they warned, and they had actual knowledge of material adverse facts undermining those warnings or risk disclosures.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against all Defendants

136. Plaintiff incorporates by reference all of the allegations set forth above.

137. During the Class Period, Defendants disseminated or approved the materially false and/or misleading statements alleged above, which they knew or recklessly disregarded were false and/or misleading or omitted material facts, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138. Accordingly, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact or failed to state material facts necessary to rendered the statements truthful and accurate; and/or (c) engaging in acts, practices and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class.

139. Consequently, Plaintiff and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for AirMedia ADRs. They would not have purchased the ADRs during the Class Period at the prices they paid, or at all, if

they had been aware that the market price of the ADRs was artificially inflated by the materially misleading statements alleged herein.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

140. Plaintiff incorporates by reference all of the allegations set forth above.

141. As alleged herein, Defendants committed primary violations of the Exchange Act during the Class Period.

142. The Individual Defendants acted as controlling persons of AirMedia within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, as well as their beneficial ownership of the Company's ordinary shares and ADRs and aspects of AirMedia's affiliates and/or primary businesses, the Individual Defendants had the power and authority to cause AirMedia to engage in the wrongful conduct complained of herein. As detailed herein, the Individual Defendants approved, disseminated and/or uttered the false and misleading statements described herein, or caused AirMedia to do so.

143. Accordingly, by reason of such conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class reasonable counsel fees and reimbursing them and their counsel for any costs and expenses incurred in this action, including expert fees; and

D. Awarding such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: January 15, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO
ALAN I. ELLMAN

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
aellman@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Counsel for Lead Plaintiff and the Proposed Class*

CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on January 15, 2016, I authorized a true and correct copy of the attached:

Amended Complaint for Violations of the Federal Securities Laws

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN