USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3-27-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------
**Jiehua Huang, Individually and on Behalf of All Others Similarly Situated,**
                        **Plaintiff,**

-against-

**AirMedia Group Inc., Harman Man Guo and Richard Peidong Wu,**
                        **Defendants.**
---------------------------------------------

1:15-cv-04966
<u>**OPINION & ORDER**</u>

**ANDREW L. CARTER, JR., District Judge:**

**I. INTRODUCTION**

Plaintiffs are purchasers of American Depository Receipts ("ADRs") belonging to Defendant AirMedia Group Inc. ("AirMedia"). Lead Plaintiff Jiehua Huang ("Plaintiff"), individually and on behalf of all others similarly situated, alleges that Defendants AirMedia, Herman Man Guo, and Richard Peidong Wu (collectively "Defendants"), misrepresented the value of AirMedia's ADRs and the finality of a publicized agreement with Shenzhen Liantronics Co., Ltd. ("Liantronics") between April 7, 2015, and June 15, 2015 (the "Class Period"). Plaintiff asserts claims under Section 10(b), Rule 10b-5, and Section 20(a) of the Securities Exchange Act of 1934 (the "SEA").

On March 10, 2016, Defendants moved to dismiss the amended complaint (the "Amended Complaint") in its entirety for failure to plead fraud with particularity, failure to state a claim, and for lack of personal jurisdiction over Defendant Richard Peidong Wu. On May 27, 2016, Plaintiff moved to strike a public securities filing appended as Exhibit J submitted in support of Defendants' motion to dismiss on the grounds that the filing is neither alleged in nor integral to the Amended Complaint.

For the reasons set forth below, Plaintiff's motion to strike Exhibit J is denied. Defendants' motion to dismiss the Amended Complaint is GRANTED in its entirety.

**II. FACTUAL ALLEGATIONS**

Plaintiff's allegations in the Amended Complaint as to the facts underlying this action are taken as true for the purposes of this motion. Defendant AirMedia provides advertising platforms

and services to businesses that primarily advertise their products in the Republic of China. Amd. Compl. ¶ 2. AirMedia trades its ADRs on the U.S. NASDAQ stock exchange. Amd. Comp. ¶ 20. During the class period, Defendant Herman Man Guo ("Guo") was, and still is, a Board of Director, Chief Executive Officer, and substantial owner of AirMedia, as well as the "actual controller" of AirMedia's advertising affiliate, AirMedia Group Co., Ltd. ("AM Advertising"). Amd. Compl. ¶ 21. During the same time frame, Defendant Richard Peidong Wu ("Wu") was, and still is, AirMedia's Chief Financial Officer. Defendant Wu allegedly maintains a residence in Carmel, IN and continues to have extensive ties to the U.S. — assertions Defendant Wu disputes. Amd. Compl. ¶ 22; Defs.' Brief at 24; March 8, 2016 Declaration of Richard Peidong Wu ("Wu Decl.," Dkt. No. 47) ¶¶ 5–9.

During the Class Period, Plaintiff and other Class members purchased AirMedia's ADRs. During that time period, Defendants allegedly engaged in a scheme to artificially inflate the value of AM Advertising and the trading price of the ADRs. Defendants did so by announcing the existence of a sham contract with the intended effect of precipitating a perception in the market that AM Advertising and AirMedia were more valuable than they were; as a result, AirMedia's market capitalization artificially inflated by more than $500 million in a matter of days. Amd. Compl. ¶ 3.

Specifically, Plaintiff alleges that in early 2015, AirMedia began implementing strategies to transform its advertising business into a "leading in-flight and on-train Wi-Fi operator in China." Id. ¶ 52. In 2015, AirMedia began discussions of an agreement for Shenzhen Liantronics Co., Ltd. ("Liantronics") to purchase 5% equity interest of AM Advertising. Id. ¶ 4. Thereafter, AirMedia issued a press release about the Liantronics agreement, dated April 7, 2015. In the press release, AirMedia announced that it had sold 5% of the equity in AM Advertising to Liantronics. Under the purported agreement, Liantronics would pay RMB 150 million in cash, which implied a value for AM Advertising of RMB 3 billion ($484 million). This valuation caused the price of AirMedia's ADRs to increase by 150% over the following three weeks. Id.

However, the press release concealed the underlying contract and failed to fully disclose the "unrealistic" contract terms. Id. ¶ 5. Chief among the contract provisions was a requirement that AM Advertising achieve an improbable $31 million profit target for fiscal year ("FY") 2015; Liantronics was given the right to terminate the transaction for any reason — an option that essentially rendered the agreement illusory. Amd. Compl. ¶ 5.

2

Just one day before the announcement, on April 6, 2015, AirMedia's ADRs traded below $2 — implying a valuation of approximately $100 million for the entire company. Id. ¶ 55. On April 8, 2015, AirMedia's ADRs closed at $2.84 — an increase of 38.54%. Id. ¶ 59. By April 17, 2015, AirMedia's ADRs closed at $4.62 — an increase of 90.1% from April 8, 2015. AirMedia's failure to disclose the unrealistic profit target and Liantronics' right to walk away accounted for the ADRs reaching a closing price of $5.00 by April 23, 2015. Id. ¶¶ 61–62.

On April 28, 2015, investor and Forbes contributor Richard Pearson published an English translation of the terms of the contract, which he found written in Chinese on Liantronics' website. He also issued a detailed report concluding that the Liantronics deal was a sham because of its unrealistic contract terms. The deal between AM Advertising and Liantronics was more accurately characterized as a short-term loan to AirMedia than a 5% sale of AM Advertising, as AirMedia had previously claimed. Pearson's investigation also disclosed that Liantronics had failed to conduct any due diligence before entering into the transaction — a fact which further supported his assertion that the deal was non-binding and illusory. Amd. Compl. ¶¶ 5, 6.

The following day, April 29, 2015, AirMedia attacked Pearson's report in a press release. The press release did not dispute Pearson's interpretation of the contract terms; rather, it appended a letter from Defendant Guo to the shareholders, in which he characterized the Liantronics transaction as "arms-length and serious" and dismissed the assertion that Liantronics had not conducted due diligence as "erroneous". Amd. Compl. ¶ 7. Plaintiffs assert that Defendants' representations had the intended (and actual) effect of concealing the truth regarding the value of AM Advertising and AirMedia, thereby boosting the trading price of the ADRs.

In a May 18, 2015 press release and earnings call, Defendants Guo and Wu again emphasized AM Advertising's strong valuation and asserted that the Liantronics transaction would proceed. Amd. Compl. ¶¶ 87, 89, 91-94. The price of the ADRs continued to climb. Amd. Compl. ¶¶ 95–96.

Six weeks later, on June 13, 2015, AirMedia announced that it would terminate the Liantronics contract in favor of a new agreement to sell 75% of AM Advertising to another buyer, Beijing Longde Wenchuang Fund Management Co., Ltd. ("Longde Wenchuang"), for RMB2.1 billion ($338 million). The new deal required AM Advertising to meet even higher profit targets; AM Advertising was obligated to earn aggregate net profit equal to or exceeding RMB1.0592 billion ($170.6 million) for combined fiscal years 2015 to 2018. If AM Advertising did not meet

3

the targets, Longde Wenchuang would be entitled to the remaining 25% interest for no additional consideration. Under the new deal, Am Advertising's valuation was approximately 30% below the total value implied in the Liantronics deal. Additionally, AM Advertising's failure to achieve the profit targets could result in the conveyance of the entire business for the initial price of just RMB2.1 billion. Amd. Compl. ¶ 9.

Plaintiff alleges that as a result of the announcement, investors learned that the valuation ascribed to AM Advertising in the earlier Liantronics transaction was artificially inflated. Furthermore, investors learned that because it was even more improbable for AM Advertising to meet the profit targets associated with the new transaction, it was a virtual certainty that AirMedia would have to transfer the remaining interest in AM Advertising to Longde Wenchuang for no consideration. Therefore, investors learned that, in the new deal, Defendants accurately valued AM Advertising, and therefore, AirMedia itself, at 30% less than implied by the purported deal with Liantronics. Amd. Compl. ¶ 11.

The price of AirMedia's ADRS dropped from $7.26 per ADR on June 12, 2015 (the day before the announcement) to $3.52 per ADR on June 18, 2015 — representing a 52% decline in value. Amd. Compl. ¶ 12. Plaintiff asserts that as a result, he and other members of the Class suffered substantial harm. Id. By contrast, Defendants Guo and Wu personally benefitted from the fraud. Id. ¶ 3. Plaintiff contends that Defendant Guo, who owns approximately 76.11% of AM Advertising, personally benefitted "by the cash infusion associated with the new transaction[s]" prior to the ADRs' decline in value. Id. ¶ 14. For his part, Defendant Wu intended to, and did, capitalize on the artificially inflated SDR price by selling large swaths of holding in AirMedia before the truth was exposed. Id. ¶ 3.

### III.   DISCUSSION

Defendants move to dismiss on several grounds. First, Defendants move to dismiss Plaintiff's claims that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 pursuant to Rules 9(b), 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA"). Specifically, Defendants assert that Plaintiff failed to: (1) allege any misstatements or omissions by any of the Defendants; (2) plead any scienter; and (3) plead loss causation. Second, Defendants move to dismiss for lack of personal jurisdiction as to Defendant Wu based on deficient service of process. Plaintiff moves to strike Exhibit J from the record and the Court's consideration.

Before addressing Defendants' Rule 9(b) and Rule 12(b)(6) motions to dismiss or Plaintiff's motion to strike Exhibit J, the Court must first address the preliminary question of service. Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963) ("logic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim.").

### A. Personal Jurisdiction

The Amended Complaint asserts that Defendant Wu, AirMedia's CFO, "maintains a residence in Carmel, Indiana, and continues to have extensive ties to the U.S." Amend. Compl. ¶ 22. On that basis, Plaintiffs hired an independent process server who attempted to serve Defendant Wu at his alleged residence in Indiana in January 2016. Affidavit of Service, ECF No. 41. According to the Affidavit of Service, service of process on Defendant Wu was attempted by affixing copies of the summons and complaint at a residence located at 358 Pintail Court, Carmel, IN 46032 and subsequently mailing copies to that address. Id. The Affidavit of Service does not contain facts establishing that personal service was ever attempted by serving Wu himself while he was in the state or by leaving copies of the summons and complaint with someone of suitable age and discretion at the residence.

Defendant Wu denies that he resides at that address. Wu Decl., ¶¶ 5–9. Plaintiffs counter that the home is a vacation home, and therefore constitutes a dwelling under the laws of New York and Indiana. Pls.' Brief at 24.

It is well-settled that "in considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction." Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F.Supp.2d 382, 387 (S.D.N.Y. 2002). "Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process." Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 658 (S.D.N.Y. 1997), aff'd, 173 F.3d 844 (2d Cir. 1999). When a defendant moves to dismiss for insufficiency of service of process, the plaintiff bears the burden of proving adequacy of the service. Mende v. Milestone Tech., 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003) (citations omitted); Preston v. New York, 223 F.Supp.2d 452, 466 (S.D.N.Y. 2002).

Federal Rule of Civil Procedure 4(e) requires a plaintiff to serve an individual within the United States either by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made" or by following federal law. Fed. R. Civ. P. 4(e)(1); see also Fed. R. Civ. P. 4(e)(2)(A)-(C). In the case at bar, the district court is located in New York and service was made in Indiana. Service of process was deficient under both.

Under New York Law, service on a party outside of New York may be made "in the same manner as service is made within the state," where the Court has jurisdiction over that party pursuant to either Section 301 or Section 302 of the CPLR. See CPLR § 313; Breer v. Sears, Roebuck & Co., 184 Misc. 2d 916, 922, 709 N.Y.S.2d 798, 802 (Sup. Ct. 2000) ("while a defendant subject to the long-arm jurisdiction of the court may be served outside of New York State, that service must be made in the foreign jurisdiction in a manner consistent with the manner of service authorized under the laws of the State of New York").

Under both New York and Indiana law, a plaintiff may "personally" serve an out-of-state defendant by delivering the summons within the state to him. CPLR § 308(1); Indiana Tr. R 4.1(a)(2). Alternatively, a plaintiff may serve an out-of-state defendant by "substitute process" delivering the summons, complaint, and acknowledgment form and return envelope to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the defendant and then. CPLR § 308(2); Indiana Tr. R 4.1(a)(1).

Where service on the defendant, either by personal or substitute service cannot be made with due diligence, a plaintiff may serve the defendant using what is colloquially known as the "nail and mail" method. CPLR § 308(4); Indiana Tr. R 4.1(b). This form of service, as the moniker implies, has two steps: affixation of the summons and complaint to the defendant's door, and a mailing. A plaintiff that has failed to attempt personal or substitute service has not conducted "due diligence" and therefore cannot avail himself of the "nail and mail" method. Smith v. Wilson, 130 A.D.2d 821, 822 (3d Dep't 1987); PacAmOr Bearings, Inc. v. Foley, 92 A.D.2d 959, 960 (3d Dep't 1983); Siegel, N.Y.Prac. § 74, at 80). See Indiana Tr. R 4.1(a)(3).

There is no dispute that under the CPLR, a vacation home can qualify as a dwelling. See Krechmer v. Boulakh, 277 A.D.2d 288, 289 (2d Dep't 2000); Washington Mutual Bank v. Murphy, 127 A.D.3d 1167, 1173, 1174-75 (2d Dep't 2015). Here, however, the Affidavit of Service does

6

not contain facts establishing that either personal or substitute service were ever attempted before utilizing the "nail and mail" method. Therefore, pursuant to New York law, service on Defendant Wu was defective.

Furthermore, Plaintiff has not demonstrated that Wu's vacation home can qualify as a "dwelling" or "usual place of abode" under Indiana law. Therefore, Plaintiff has failed to demonstrate that service via the "nail and mail" method at Wu's vacation home was effective. Indiana Tr. R 4.1(a)(3); Mills v. Coil, 647 N.E.2d 679, 681 (Ind. Ct. App. 1995) (holding that service of complaint by certified mail at address defendant had vacated three months before plaintiffs filed suit was not reasonably calculated to inform defendant of suit and was insufficient to confer personal jurisdiction over defendant, notwithstanding that home at address was still owned by defendant's mother and that mother eventually received complaint via forwarding order). Thus, Plaintiff has not met his burden of showing that pursuant to Indiana law, service on Defendant Wu was sufficient. Accordingly, the Amended Complaint is dismissed as against Defendant Wu.

### B. Motion to Dismiss

Remaining Defendants move to dismiss Plaintiff's Securities Exchange Act Section 10(b) and 20(a) claims, as well as Plaintiff's Rule 10b-5 claim. Defendants assert that dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Amended Complaint fails to meet the pleading standards set out in Federal Rule of Civil Procedure 9(b) and the PSLRA. For the reasons discussed below, Defendants' motion is granted.

#### i. Legal Standard

On a motion to dismiss, "a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor." In re Lehman Bros. Sec. & ERISA Litig., 683 F.Supp.2d 294, 298 (S.D.N.Y. 2010) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the complaint must articulate sufficient factual allegations "to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact.)" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). The plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Id. at 570. A claim has "facial plausibility" if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citation omitted). Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice.[1] Sgalambo v. McKenzie, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)); Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000); 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007).

### ii. Relevant Securities Laws

Section 10(b) of the Securities Exchange Act makes it unlawful for

> any person for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [,] any manipulative or deceptive device or contrivance[.]

15 U. S.C. § 78j(b). Rule 10b–5, which was promulgated under Section 10(b), makes it unlawful:

---

[1] A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). See also Alvarez v. County of Orange, 95 F. Supp. 3d 385, 398 (S.D.N.Y. 2015) (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1988)) ("Put another way, facts appropriate for judicial notice must 'meet either [one of the] test[s] of indisputability contained in Rule 201(b): they [should be] common knowledge, [or] . . .derived from an unimpeachable source.'").

Where public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records. Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993). If the court takes judicial notice, it does so in order "to determine what statements [they] contained"— but "again not for the truth of the matters asserted." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). Here, Defendants' Exhibit J, offered in support of their motion to dismiss is a copy of a printout that appears to be from the website of the Shenzen Securities Exchange, one of the three stock exchanges in China. The printout confirms Liantronics' public filing of its April 7 announcement of its intention to purchase a 5% stake in AM Advertising.

A review of Exhibit J leads the Court to conclude that the announcement is similar in substance to the one published on the Liantronics website, and upon which Pearson based his report. Therefore, the Liantronics announcement can be considered integral to Plaintiff's Amended Complaint. The Court takes judicial notice of the announcement. Although the Court has exercised its discretion to do so, this opinion is based entirely on other documentation offered in support of the parties' respective submissions to which Plaintiff has articulated no objection. Thus, the motion to strike is essentially moot.

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To succeed on a Section 10(b) and Rule 10b-5 claim, Plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) in connection with the purchase or sale of securities; (4) Plaintiff's reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A., 838 F.3d 214, 217 (2d Cir. 2016) (quoting Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014)); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).

Pursuant to Section 20(a),"[e]very person who, directly or indirectly, controls any person liable under [the Securities Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a Section 20(a) claim, Plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns., 493 F.3d at 108.

### iii. Heightened Pleading of Fraud Claims under Federal Rule of Civil Procedure 9(b) and the PSLRA

Securities fraud claims are subject to the heightened pleading requirements Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake," as well as the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b). ATSI Commc'ns., 493 F.3d at 99 (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); Arco Capital Corp. v. Deutsche Bank AG, 949 F. Supp. 2d 532, 539 (S.D.N.Y.

2013) (same). Although malice, intent, knowledge and other conditions of a person's mind may be alleged generally, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (citations omitted). A complaint alleging securities fraud will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference [of non-fraudulent intent] one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (citations omitted).

In particular, the PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter (the defendant's intention "to deceive, manipulate, or defraud"). Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976)). To satisfy the scienter requirement, the complaint must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable." Tellabs, 551 U.S. at 314. A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

In order to evaluate whether the PSLRA's scienter standard has been met, courts consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc., 551 U.S. at 323 (emphasis in original). When the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). Accordingly, the facts pled must either demonstrate "that the defendants had the motive and opportunity to commit fraud" or constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).

In order for the plaintiff to "raise a strong inference of scienter through 'motive and opportunity' to defraud, [the plaintiff] must allege that [defendants] benefitted in some concrete and personal way from the purported fraud." Id. (citations omitted). It is insufficient for the plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer

10

compensation[.]" Id.; Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive . . . which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

If the plaintiff is unable to demonstrate motive, "it is still possible to plead scienter by identifying circumstances" indicative of conscious misbehavior or recklessness on the part of the defendant, "though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting Beck v. Mfrs. Hanover Tr. Co., 820 F.2d 46, 50 (2d Cir. 1987)). Conscious misbehavior or recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)). To sufficiently plead conscious recklessness, the plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." In re Carter–Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000). The plaintiff may allege that the defendants "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor." Nathel v. Siegal, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing Novak, 216 F.3d at 311).

However, the PSLRA has a safe harbor provision that "protects forward-looking statements when they are identified as forward-looking and are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 178-79 (S.D.N.Y. 2012). "Mere opinions and predictions of future performance are not actionable under the securities laws unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." In re International Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998). For example, representations that a merger was "on track . . . could not possibly be understood as anything but opinions" because of "the usual level of uncertainty as to whether any proposed merger will actually be completed." Elliott Assocs., L.P. v. Covance, Inc., 2000 WL 1752848, at *2 (S.D.N.Y. Nov. 28, 2000). "Optimistic, vague projection[s] unaccompanied by any specific quantification

11

or projected results implying certainty . . . falls short of qualifying as a material misrepresentation under Rule 10b-5." Covance, 2000 WL 1752848, at *10.

### iv. Analysis

Plaintiff alleges that Defendant Guo and Defendant Airmedia violated Section 10(b) and 20(a), as well as Rule 10b-5 when Guo and Airmedia made representations in connection with AM Advertising's purported deals with Liantronics and Longde Wenchuang. In particular, Plaintiff contends that Defendant Guo made representations that gave the market a false impression that: (1) AirMedia's and AM Advertising's valuation and market capitalization were accurately stated in the Liantronics deal; (2) AirMedia intended to perform the Liantronics contract; (3) and AirMedia was in a financial position to achieve the profit targets imposed by the Liantronics and Longde Wenchuang deals.

Because Section 20(a) liability can only arise if there is a primary violation by a controlled person, the Court considers first whether Plaintiff has adequately pled that Defendant Guo violated Section 10(b) and Rule 10b-5. See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C., 829 F.3d 173, 177 (2d Cir. 2016) (quoting ECA, 553 F.3d 187, 207 (2d Cir. 2009)).

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has not articulated sufficient factual allegations to carry its assertions beyond the bar of speculation. First, Plaintiff has not asserted any facts to indicate that at the time Defendant Guo made any of his statements, the statements were outright untrue. Plaintiff's only proof is his conclusory allegation that Guo's representations and the accompanying disclosures by AirMedia created an impression in the market about the valuation of AM Advertising and AirMedia.

However, the disclosures themselves undermine Plaintiff's argument. First, the disclosures explicitly invoke the PSLRA safe harbor for forward-looking statements. The documents informed investors that the announcement of the Liantronics deal concerned AirMedia's "strategic and operational plans," and cautioned that the representations constituted "beliefs and expectations" involving "inherent risks and uncertainties," rather than a quantitative representation on the part of Guo and AirMedia. April 7 Press Release, at 2; April 29 Press Release, at 2-3. Second, the disclosures provided non-exhaustive lists of risks that could thwart the Liantronics deal, including potential "cash flow" issues, diminishing revenues, and adjustments to "growth

12

strategies" and "business development" plans. April 29 Press Release, at 3. Moreover, nowhere in Guo's representations or in the accompanying disclosures did Guo or AirMedia represent that the Liantronics deal was anything other than an "optimistic, vague projection." Covance, 2000 WL 1752848, at *10. Indeed, the fact that Pearson drew an unfavorable conclusion about AirMedia and AM Advertising's valuations demonstrates that no reasonable investor would attach importance to Guo's public statements in deciding to buy AirMedia's ADRs during the Class Period. Therefore, Guo's representations cannot be classified as misstatements.

Because Plaintiff fails to allege any actual misstatement on the part of Defendant Guo, Plaintiff's ability to establish his Section 10(b) and Rule 10b-5 claims turns on the existence of actionable omissions by Defendant Guo — namely that Guo failed to disclose material adverse information about AirMedia and AM Advertising business, prospects, and valuation. Plaintiff asserts that: (1) Guo's April 7 press release concealed the contract underlying the Liantronics deal; and (2) Guo's April 7 press release omitted details about Liantronics' right to walk away from the deal and purported "profit targets." Amd Compl. ¶¶ 58, 61, 63, 65, 79. These assertions are directly contradicted by AirMedia's multiple public disclosures concerning precisely the information Plaintiff complains was missing from the April 7 press release: the contract, pricing basis, payment terms, payment time, and walk-away provision. April 24 Form 20-F, at 30.

Accordingly, Plaintiff is unable to prove a material representation or omission by Guo. Thus, Plaintiff's Section 10(b) and Rule 10b-5 claims against Defendant Guo fails and the case against him must be dismissed. Additionally, because Plaintiff has not stated a primary violation under Section 10(b) and Rule 10b-5 by the "controlling person," Defendant Guo, Plaintiff's Section 20(a) claim against AirMedia also fails. Thus, Plaintiff's claims against all defendants pursuant to Section 10(b), Section 20(a), and Rule 10b-5 must be dismissed.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the case against Defendant Wu for lack of personal jurisdiction based on deficient service is granted with prejudice. Defendants' motion to dismiss the Amended Complaint for failure to state a claim is granted with prejudice. Plaintiff's motion to strike Exhibit J is denied. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close the case.

**SO ORDERED.**

Dated:  March 25, 2017
        New York, New York

                                               ANDREW L. CARTER, JR.
                                               **United States District Judge**